UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

TERRANCE D. BOLDEN,

                Petitioner,                Case No. 1:11-cv-1197

v.                                  Honorable Paul L. Maloney

KENNETH T. McKEE,

                Respondent.

_____/

## OPINION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner is serving a term of 10 years to 25 years[1] for armed robbery consecutive to two concurrent sentences of two years for felony firearm.  Petitioner was sentenced as a third habitual offender, MICH. COMP. LAWS § 769.11, by the Calhoun County Circuit Court on November 29, 2007, after a jury convicted Petitioner of armed robbery, MICH. COMP. LAWS § 750.529, felon in possession of a firearm, MICH. COMP. LAWS § 750.224f, and two counts of felony firearm, MICH. COMP. LAWS § 750.227b.  In his *pro se* petition, Petitioner raises six grounds for relief, as follows:

I.        Petitioner believes and the state appellate court agreed that Petitioner's 6th amendment right to confrontation and cross examination were violated when the state elicited hearsay testimony from a law enforcement officer that a absent non-testifying eyewitness identified Petitioner.

II.        Petitioner believes his due process 14th and 16th amendment rights to present a defense were violated by the trial court's legal preclusion to instruct the jury on the requested lesser offense of "accessory after the fact."

_____

[1]The sentence of 10 to 25 years for armed robbery is concurrent with a sentence of 2 years, 6 months to 10 years for felon in possession of a firearm.

III.     Petitioner believes his due process rights were violated by the state court's failure to grant a motion for DNA testing of hair collected from a ski mask that was found with the proceeds of the robbery.

IV.    Petitioner believes his due process and 4th amendment rights were violated when his conviction was secured with evidence obtained by a warrantless search with evidence obtained by invalid and/or coerced consent to search and with evidence seized from a closed container.

V.    Petitioner believes his due process and his 5th and 6th amendment rights were violated and his conviction secured by an improperly instructed jury.

VI.    Petitioner was denied his 6th amendment right to effective assistance of counsel where trial counsel failed to move to suppress illegally-seized evidence (which had no strategic value), and where trial counsel failed to request a cautionary instruction regarding dog-tracking evidence.

(Pet., ECF No. 1, PageID.5-6.)  To each of the above-listed grounds, Petitioner adds the following closing sentence: "The evidence is insufficient to support the convictions in this case."  (*Id.*) Respondent has filed an answer to the petition (ECF No. 7) stating that the grounds should be denied. Upon review of the pleadings and the record, the Court will deny the petition for failure to raise a meritorious federal claim.

## Procedural History

### A.    Trial Court Proceedings

The prosecution arose from an incident on March 30, 2007, in Battle Creek, Michigan.  The testimony at trial revealed that, on that day, at 10:00 p.m., manager Jennifer Nay closed the Kentucky Fried Chicken restaurant on Columbia Avenue.[2]  (ECF No. 14, p. 98.) She then readied the restaurant for the next day, completed her paperwork, and prepared the night deposit.

---

[2]The trial transcripts will hereafter be referred to as follows:

Vol. I, Nov. 2, 2007:  "ECF No. 13, p.___";
Vol. II, Nov. 6, 2007:  "ECF No. 14, p.___";
Vol. III, Nov. 7, 2007:  "ECF No. 15, p.___."

(*Id*. at pp. 98-101.)  It was about 11:00 p.m. when she, with the evening deposit bagged and in her

pocket, left the restaurant with her fellow employees, Tricia Kilbourn and Devon Jones.  (*Id*.)  As

Ms. Nay neared her vehicle, she was approached by a masked man brandishing a handgun.  (*Id*. at

pp. 102-104.)  The man poked her in the side with the gun and demanded the money.  (*Id*. at pp. 104,

107-108.)  Ms. Nay gave the man the deposit bag and he fled on foot.  (*Id*. at p. 113.)

Ms. Kilbourn testified that she was working as a cook and cashier at KFC during

March of 2007.  (*Id*. at p. 7.)  She was next to Ms. Nay as they walked to their cars in the KFC

parking lot after work.  (*Id*. at p. 8.)  She was about five steps away and had turned to get into her

car when she heard the robber demand the money.  (*Id*. at pp. 12, 16.)[3]  She observed Ms. Nay

initially hesitate and then reach into her pocket for the deposit bag.  (*Id*. at p. 22.)  The gunman took

the bag and, waving the gun back and forth, ran away.  (*Id*.)  She and Ms. Nay went back into the

restaurant and waited for the police to arrive.  (*Id*. at p. 24.)

Ms. Kilbourn described the gunman as five feet, nine inches to five feet, ten inches

tall.  (*Id*. at p. 14.)  The night of the robbery, however, she told police the gunman was six feet, three

inches tall.  (*Id*. at pp. 14-15.)  She described the gunman further as a black man wearing primarily

black clothes including a black ski mask.  (*Id*. at pp. 14-21.)  Ms. Nay also testified that the gunman

wore all dark colors.  (*Id*. at p. 103.)  Specifically, she said the gunman wore blue jeans, white tennis

shoes, a dark colored hooded sweatshirt, and a ski mask.  (*Id*. at p. 110.)  She testified that the

gunman was six feet, one inch to six feet, two inches tall.  (*Id*. at 108.)  The night of the robbery,

however, she too had estimated the gunman's height at six feet, three inches.  (*Id*. at 109-10.)  She

---

[3]Ms. Nay and Ms. Kilbourn both testified that Mr. Jones was in his vehicle when the robbery occurred.  (*Id*. at p. 8, 115.)

also noted that the gunman had facial hair, a goatee.  (*Id*. at p. 111.)  At trial, both Ms. Kilbourn and Ms. Nay identified Petitioner as the gunman.  Mr. Jones did not testify.

After the gunman fled, Ms. Nay, Ms. Kilbourn and Mr. Jones went back into the restaurant.  (*Id*. at p. 115.)  The Battle Creek Police arrived within a few minutes.  (*Id*.)

Battle Creek Police Officer Benjamin Clark was the first officer to arrive at the KFC restaurant.  (*Id*. at p. 67.)  Officer Clark listened to each of the KFC employees describe the gunman.  (*Id*. at pp. 69-70.)  The descriptions were all the same.  (*Id*.)  Officer Clark immediately broadcast the description: black male, six feet, three inches tall, slender build, wearing blue jeans, a black fleece, and a black ski mask, carrying a small black handgun.  (*Id*.)  He also broadcast that the gunman had fled across Columbia Avenue.  (*Id*. at p. 73.)

After about fifteen minutes, Officer Clark was contacted by Lieutenant Duane Knight who informed Officer Clark that he had stopped a vehicle with a passenger that matched the description of the gunman.  (*Id*. at pp. 73-75.)  Officer Clark transported Ms. Kilbourn to the stopped vehicle.  (*Id*. at pp. 75-76.)  She indicated that the suspect was not the gunman.  (*Id*. at p. 76.)

Officer Clark then learned that Sergeant Palmer had identified another possible suspect in the area of 128 South 22nd Street.  (*Id*. at p. 77.)  Officer Clark transported Ms. Kilbourn to that location.  (*Id*.)  The suspect, who Officer Clark identified at trial as Petitioner, was sitting by the curb at that address.  (*Id*. at pp. 77-78.)  Ms. Kilbourn was sure the suspect was the gunman once she heard his voice.  (*Id*. at pp. 53-54.)  As part of her testimony, she identified Petitioner as the suspect she had identified the night of the robbery.  (*Id*. at p. 54.)

Officer Clark took each of the KFC employees to the address to see the suspect.  (*Id*. at pp. 80-81.)  He then said that the responses of the employees did not differ.  (*Id*. at p. 81.)

- 4 -

The police did not identify Petitioner as a suspect by accident.  They were led to the area where they found Petitioner by a police tracking dog.  Lieutenant John Chrenenko testified that he and his canine partner, Heff, responded to the KFC within ten minutes of hearing the call regarding the robbery.  (*Id.* at pp. 140-141.)  By radio, he had already asked Officer Clark to "keep the location clean . . . ," by preventing others from being present in the area where the incident occurred, the "starting point."  (*Id.* at pp. 141-142.)  Heff led the Sergeant Chrenenko to a point on 22nd Street where Heff became distracted by a cat just inches from the track.  (*Id.* at pp. 142-145.)  According to Chrenenko, that was "game over."  (*Id.* at p. 145.)

As Sergeant Chrenenko tracked the gunman, other officers established a perimeter.  Officer Kusler had the position behind the mall area near the path followed by Heff.  (*Id.* at p. 151.)  While maintaining the perimeter, Officer Kusler spoke with a person riding a bicycle.  (*Id.*)  That person told the officer that two black males with ski masks had run from the mall parking lot and through the gate that leads to 22nd Street.  (*Id.* at pp. 151-52.)  The person pointed towards a building with the address 128 South 22nd Street. (*Id.* at p. 154.)

Officer Kusler drove to that address where he encountered Sergeants Chrenenko and Palmer.  (*Id.* at 155.)  He relayed what he had learned to Sergeant Palmer.  (*Id.*)

Sergeant Palmer testified that he, too, had worked to establish a perimeter.  (*Id.* at p. 164.)  He was behind Columbia Plaza when he observed two males wearing dark clothing pacing in front of a residence.  (*Id.* at p. 167.)  A third individual walked up, they conversed, and the two males proceeded north.  (*Id.*)  The third individual headed south and then cut in between the building at 128 S. 22nd Street and the neighboring building.  (*Id.* at pp. 167-68.)  Sergeant Palmer's

- 5 -

description of the third individual's clothing matched the description of the gunman.  (*Id*. at pp. 168-69.)

Eventually, Sergeant Palmer met up with Sergeant Chrenenko at the end of Heff's track.  (*Id*. at p. 172.)  Based on the accumulating information, Sergeant Palmer called for backup and, accompanied by the additional responding officers, he knocked at the door at 128 S. 22nd Street.  (*Id*. at pp. 172-73.)  The individual identified as the person in charge of the residence, Mr. McGuire, permitted the police to enter and look around.  (*Id*. at pp. 175-78.)  Sergeant Palmer found Petitioner in one of the bedrooms; Sergeant Palmer believed Petitioner to be the third individual he had observed earlier.  (*Id*. at pp. 179-84.)  Sergeant Palmer saw a black fleece hooded sweatshirt and a walkie-talkie on the bed.  (*Id*. at p. 186.)

Sergeant Palmer directed Officer Brady to search the room where he found Petitioner.  (*Id*. at p. 203.)  He located a black and red duffle bag in the room.  (*Id*. at pp. 203-05.)  The bag included a KFC cup with an orange glove inside; inside the glove he found the KFC night deposit slip prepared by Ms. Nay and a deposit bag.  (*Id*. at pp. 208-09.)  The bag also contained black gloves, a black mask, a black handgun, and $543.42 in cash.  (*Id*. at pp. 210-19.)

Mayoula Thompson, Petitioner's grandmother, testified that Petitioner lived with her, at an address that was different than the apartment on 22nd Street.  (*Id*. at p. 234.)  She testified that the apartment on 22nd Street belonged to Petitioner's cousin.  (*Id*. at p. 239.)  She indicated that the black handgun was hers and that it had been removed from under her pillow without permission.  (*Id*. pp. 234-37, 239-40.)

Petitioner presented one witness, Attorney Ronald Pichlik.  (ECF No. 15, pp. 17-26.)  Mr. Pichlik represented Petitioner in connection with a line-up conducted on August 7, 2007.  (*Id*.

- 6 -

at pp. 18-19.)  Mr. Pichlik described the line-up procedure and noted that in both phases (with and without masks), Ms. Kilbourn identified someone other than Petitioner as the gunman.  (*Id*. at pp. 19-25.)  Ms. Kilbourn testified that the line-up participants did not speak.  (ECF No. 14, p. 30.)  She also testified that she indicated at the time she was not sure (*Id*. at pp. 48-49.)  Ms. Nay participated in the line-up as well.  She identified Petitioner as the robber, with certainty, whether or not he wore the mask.  (*Id*. at pp. 118-122.)

The jury returned a verdict of guilty on all charges within three hours.  (*Id*. at p. 90.)  On November 29, 2007, Petitioner was sentenced as outlined above.  (ECF No. 16.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on July 24, 2008, raised the first three of his habeas issues.[4] (*See* Def.-Appellant's Br. on Appeal, ECF No. 17.)  By unpublished opinion issued on May 19, 2009, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* Mich. Ct. App. Op., ECF No. 17.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same three issues raised before and rejected by the Michigan Court of Appeals.  By order entered November 23, 2009, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  *People v. Bolden*, No. 139246, 2009 WL 2974772 (Mich. Nov. 23, 2009).

---

[4]Petitioner's third appellate issue contended that due process required post-conviction DNA testing of  hair found in the ski mask.  At the same time he filed his appellate brief, Petitioner moved for remand in connection with that issue.  Remand would permit Petitioner to present the issue for the first time to the trial court.  (See Motion to Remand, ECF No. 17.)  On September 3, 2008, the court of appeals denied the motion.  (*See* Order, ECF No. 17.)

### C.      Motion for relief from judgment

Petitioner returned to the Calhoun County Circuit Court, filing a motion for relief from judgment under MICH. CT. R.  6.500 et seq., on May 13, 2010.  In his motion he raised issue IV (invalid search) and Issue V (failure to give tracking-dog cautionary instruction) from this habeas petition.  (Mot. for Relief from J., ECF No. 21.)  He also raised habeas issue VI (ineffective assistance of trial counsel for failing to raise Issues IV and V at trial).  The trial court denied Petitioner's motion stating:

> Defendant's convictions are based upon a jury verdict.  As such, he had the right to appeal the convictions, and did so with the assistance of an appellate attorney.  The issues raised by the Defendant in his Motion for Relief from Judgment could have been raised on appeal and were not.  Defendant has not demonstrated good cause for the failure to do so.

(ECF No. 22, p. 2.)

Petitioner filed applications for leave to appeal the denial of his motion in the Michigan Court of Appeals and the Michigan Supreme Court.  Those courts denied leave by orders dated November 19, 2010 (ECF No. 19), and July 25, 2011 (ECF No. 20), respectively.

On November 9, 2011, Petitioner commenced this action.

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant

to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 132 S. Ct. 38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas

petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.  *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference).   The presumption, however, is not irrebuttable.  *Johnson*, 133 S. Ct. at 1096.  Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review.  *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## Discussion

### I.     Officer Clark's testimony regarding Mr. Jones' identification of Petitioner as the gunman

Testimonial out-of-court statements by witnesses are barred under the Confrontation Clause unless witnesses are unavailable and the defendant had a prior opportunity to cross-examine witnesses, regardless of whether such statements are deemed reliable by court. *Crawford v. Washington*, 541 U.S. 36 (2004) (abrogating *Ohio v. Roberts*, 448 U.S. 56 (1980)). "The Confrontation Clause guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent, the defense might wish.'" *United States v. Owens*, 484 U.S. 554, 559 (1988) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987); *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

"Unconstitutional limitations on cross-examination are normally subject to harmless-error analysis." *Hargrave v. McKee*, 248 F. App'x 718, 728 (6th Cir. 2007) (citing *Van Arsdall*, 475 U.S. at 681-84). On habeas review, a court must assess harmlessness under the standard set forth

in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), regardless of whether the state appellate court recognized the error and reviewed it for harmlessness. *See Hargrave*, 248 F. App'x at 738 (citing *Fry v. Pliler*, 127 S. Ct. 2321, 2328 (2007)); *see also Vasquez*, 496 F.3d at 574-75. The *Brecht* standard requires the Court to consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result. In determining whether the restriction was harmless, a court must consider a number of factors, "'includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *Hargrave*, 248 F. App'x at 728 (quoting *Van Arsdall*, 475 U.S. at 684).

Here, the Michigan Court of Appeals conceded the error, but concluded it was harmless:

> We conclude that Jones' statements were testimonial hearsay. Jones made the statements after the robbery had already occurred in response to police investigation in order "to establish or prove past events potentially relevant to later criminal prosecution." *Davis [v. Washington,* 547 U.S. 813,] 822 [2006]. An objective witness would reasonably believe that his statements would be used at a later trial. *See [People v.] Jambor*, [729 N.W. 2d 477,] 487 [(Mich. App. 2007)]. And, the statements were used to prove the truth of the matter asserted. See MRE 801(C). To prove that defendant was the robber, Officer Clark testified that the three eyewitnesses, including Jones, gave him the same description of the robber and that all three eyewitnesses identified defendant as the robber at the show-up. Further, during closing argument, the prosecution used Jones' statements to bolster the identification of another eyewitness.

> Despite the fact that defendant's constitutional right to confront the witnesses against him was plainly violated, the error does not warrant reversal because it was not outcome determinative. Other evidence strongly supported defendant's conviction. Eyewitnesses Jennifer Nay and Tricia Kilbourn provided substantially similar descriptions of the robber. Both Nay and Kilbourn positively identified defendant by physical appearance and by voice. In addition, a tracking dog tracked

- 12 -

the robber's scent to the middle of 22nd Street, within 30 yards of the residence located at 128 S. 22nd Street, where defendant was found.  A black male in clothing matching Nay and Kilbourn's description of the robber was seen meeting two other black males in front of the residence and then disappearing behind it.  Minutes later, defendant was found inside the house with clothing matching descriptions of the robber and the black male seen disappearing behind the house.  Defendant was also found with a black ski mask, the KFC deposit bag and deposit slip, his grandmother's gun which matched Nay and Kilbourn's description of the robber's gun, and about one third of the night deposit money from KFC.

Moreover, defense counsel removed any bolstering effect Jones' alleged identification statement might have had by eliciting from Officer Clark on cross examination that Jones did not identify defendant as the robber, but merely said that defendant's clothes were similar to the robber's clothes.  Given the other evidence implicating defendant as the robber and given that defense counsel negated the effect of Officer Clark's testimony via cross examination, Jones' testimonial hearsay was not outcome determinative.

(Opinion, ECF No. 17, p.2.)[5]  The Michigan Court of Appeals analysis of the impact of the confrontation clause violation is not inconsistent with or contrary to clearly established federal law as expressed in *Brecht*.  Accordingly, Petitioner is not entitled to habeas relief.

---

[5]Petitioner presents the issue as if the prosecutor had elicited the testimony that ran afoul of the confrontation clause.  That does not appear to have been the case.  The Michigan Court of Appeals correctly determined that "[t]o prove that defendant was the robber, Officer Clark testified that the three eyewitnesses, including Jones, gave him the same description of the robber, and that all three eyewitnesses dientified defendant as the robber at the show-up." *People v. Bolden*, No. 282601, p. 2  (Mich. App. May 19, 2009) (ECF No. 17.)   The first proposition, that Clark testified the three eyewitnesses gave the same description of the robber, was developed through questioning by the prosecutor.  The second proposition, however, that Clark testified all three eyewitnesses identified Petitioner as the robber at the show-up, came into the record only through the questioning of Petitioner's counsel.  Indeed, it appears the prosecution carefully avoided eliciting that testimony from Officer Clark.  Instead, the record supports the contention that Petitioner's counsel elicited that testimony from Officer Clark.  See (ECF No. 14 at p. 85.) Petitioner's counsel then explored in detail exactly what Mr. Jones said, ultimately soliciting from Officer Clark testimony that Mr. Jones' positive identification related only to the similarity of the suspect's clothing to that of the assailant.  (*Id*. at pp. 85-91.)  Ultimately, Petitioner's counsel's strategy of eliciting the testimony proved sound in that he was able to demonstrate that all three eyewitnesses did not identify the suspect as the gunman.

## II.    "Accessory after the fact" jury instruction

Petitioner argues that the evidence regarding his identification as the gunman was weak.  At best, Petitioner contends, he was in possession of the implements used in the robbery and some of the proceeds.  He offers the possibility that he served as an accessory after the fact by agreeing to hide those items after he met the two men on 22nd Street.  Accordingly, Petitioner claims entitlement to a jury instruction on the lesser-included offense of accessory after the fact jury instruction.

The Sixth Circuit Court of Appeals, sitting en banc, has held that the failure to give an instruction on a lesser-included offense, even when requested by counsel, is not of the "character or magnitude which should be cognizable on collateral attack."  *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (en banc).  The *Bagby* Court held that failure to instruct on lesser-included offenses in a noncapital case is reviewable in a habeas corpus action only if the failure results in a miscarriage of justice or constitutes an omission inconsistent with the rudimentary demands of fair procedure.  *Id.*; *accord Tegeler v. Renico*, 253 F. App'x 521, 524 (6th Cir. 2007); *Todd v. Stegal*, 40 F. App'x 25, 28-29 (6th Cir. 2002); *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002); *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001); *Samu v. Elo*, 14 F. App'x 477, 479 (6th Cir. 2001); *Williams v. Hofbauer*, 3 F. App'x 456, 458 (6th Cir. 2001).  Shortly after the Sixth Circuit decision in *Bagby*, the Supreme Court emphasized that the fact that an instruction was allegedly incorrect under state law is not a basis for habeas relief.  *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6 (1983)).  Instead, the only question on habeas review is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction

- 14 -

violates due process." *Id.* at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 14 (1973)), *cited in Todd*, 40 F. App'x at 29.

Here, there is no miscarriage of justice or fundamental defect in due process.  The Michigan Court of Appeals determined first that accessory after the fact is not truly a lesser included offense of armed robbery and then further explained:

> "'The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.'" *People v Peals*, 720 NW2d 196 (2006), quoting *Chambers v Mississippi*, 410 US 284, 294 (1973). Defendant was accused of armed robbery.  Defendant was free to, and in fact did, cross examine the prosecution's witnesses and present proofs to the jury in order to defend himself against that accusation.  The legal preclusion of an accessory after the fact instruction did not violate defendant's right to present a defense because defendant was not accused of being an accessory after the fact.

> Further, defendant had no right to be charged as an accessory after the fact to the armed robbery.  Although a defendant has the right to notice of the charged offense and has the right to defend himself against the charged offense, it is the prosecution that has "the right to select the charge and avoid verdicts on extraneous lesser offenses preferred by the defendant." *People v Perry*, 594 NW2d 477 (1999). The prosecution chose to charge defendant with armed robbery.  Defendant had the right to defend against that charge but had no right to select the charge of accessory after the fact.

(Opinion, ECF No. 17, p. 3) (parallel citations omitted).

Even if accessory after the fact were a lesser include offense of armed robbery, no clearly established Supreme Court authority requires lesser-included offense instructions in non-capital cases.  The Michigan courts' resolution of the claim is in no way contrary to or inconsistent with clearly established federal alw.  Thus, under the AEDPA, 28 U.S.C. § 2254(d)(1), this claim is not a basis for habeas relief.  *Todd*, 40 F. App'x at 28 (citing *Estelle*, 502 U.S. at 71-72)).

### III.     Post conviction DNA testing

Petitioner asked the Michigan Court of Appeals to remand to permit him to pursue post-conviction testing of hair from the ski mask.  He now contends the refusal of the state court to permit that post-conviction testing violated his right to due process.  Petitioner does not contend that the prosecution somehow suppressed exculpatory evidence.  He offers no reason to believe he was not fully aware of the ski mask or that it might contain hairs to be subjected to testing.  Petitioner simply did not request such testing before or during his trial.  He raised the issue for the first time after his convictions.  The Michigan Court of Appeals determined that he had "not established a right to post-conviction DNA testing."   (Opinion, ECF No. 17, p. 3.)

The Supreme Court has recognized that the federal constitution does not provide a broad, freestanding right to access DNA evidence in the post-conviction setting.  *See Dist. Atty's Office v. Osborne*, 129 S. Ct. 2308, 2312 (2009).  "A criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man."  *Id.* at 2320.  Instead, states have "flexibility in deciding what procedures are needed in the context of postconviction relief."  *Id.* at 2320.  Where a state has created a post-conviction right to access DNA evidence, a prisoner has only a limited liberty interest in the procedure.  *Id.* at 2319-20.  "Federal courts may upset a state's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive right involved.  *Id.* at 2320.  The *Osborne* Court reviewed Alaska's judicially created procedures for accessing DNA evidence, which provides for discovery of DNA evidence when that evidence is newly available, material and diligently pursued.  The Court concluded that Alaska's procedures, which tracked both federal law, *see* 18 U.S.C. § 3600(a), and the law of other states, were "not inconsistent with the 'traditions and conscience of our people' or with 'any recognized

principle of fundamental liberty.'" *Osborne*, 129 S. Ct. at 2320-21 (quoting *Medina v. California*, 505 U.S. 437, 446 (1992).

In Michigan, postconviction access to DNA evidence is governed by statute.  *See* MICH. COMP. LAWS § 770.16.  Michigan makes DNA evidence available postconviction in certain circumstances:  when DNA testing was done, the testing was incomplete, and current testing is likely to provide conclusive results.  MICH. COMP. LAWS § 770.16(1)(a)-(c).  In addition, if the convicted person is unable to discover the location of the DNA, he may file a petition in the circuit court seeking a hearing on whether the information is available, and the court may order the appropriate agencies to complete a search.  After such search is completed, the circuit court is required to order DNA testing if the evidence is material to the issue of the identity of the perpetrator and a sample is available, the biological material was not previously tested or was tested when current technology was not available, and the identity of the perpetrator was at issue during the trial.   MICH. COMP. LAWS § 770.16(4).

As the Supreme Court concluded following consideration of the Alaska procedure, nothing about the Michigan procedure is inadequate to vindicate the interest involved.  *Osborne*, 129 S. Ct. at 2320.   The statute provides significant procedural protections to a convicted person who seeks access to DNA evidence.   The procedural protections under the Michigan statute are comparable to those established in the federal statute, 18 U.S.C. § 3600, which the Supreme Court has cited with approval.  *See Osborne*, at 2320-21. Nothing in the Michigan procedure is inconsistent with a recognized principal of fundamental liberty.   *Id.* at 2321. As a consequence, Plaintiff's due process challenge to the denial of DNA testing is without merit.

- 17 -

### IV. Issues IV, V, and VI are barred by Petitioner's procedural default

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an independent and adequate state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state court decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

The last reasoned state court decision in this instance is the trial court's order denying Petitioner's motion for relief from judgment.[6] The court reasoned: "The issues raised by the Defendant in his Motion for Relief from Judgment could have been raised on appeal and were not. Defendant has not demonstrated good cause for the failure to do so." (ECF No. 22, p. 2.) That is

---

[6]The Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal in a single sentence. *See* (ECF No. 19) ("The application for leave to appeal is DENIED for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)."); (ECF No. 20) ("On order of the Court, the application for leave to appeal the November 19, 2010 order of the Court of Appeals is considered, and it is DENIED, because the defendant has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)"). In *Guilmette v. Howes*, 624 F.3d 286, 289-90 (6th Cir. 2010), the Sixth Circuit, in an en banc decision, held that brief form orders by the Michigan appellate courts invoking MICH. CT. R. 6.508(D) are unexplained orders within the meaning of *Ylst*, 501 U.S. at 803. Such form orders are presumed to uphold or reject the last reasoned decision below. *Guilmette*, 624 F.3d at 291-92 (citing *Ylst*, 501 U.S. at 803).

simply a restatement of the procedural bar set out in MICH. CT. R. 6.508(D): "The court may not grant relief to the defendant if the motion . . . (3) alleges grounds for relief . . . which could have been raised on appeal from the conviction and sentence . . . unless the defendant demonstrates (a) good cause for failure to raise such grounds on appeal . . . ." *Id.*

In assessing how "firmly" a state procedural rule has been established, the critical inquiry is whether, viewed from the time of the petitioner's later significant actions or inaction, the petitioner could be deemed to have been apprised of the procedural rule's existence. *Luberda v. Trippett*, 211 F.3d 1004, 1006–07 (6th Cir.2000). Because MICH. CT. R. 6.508(D) was enacted in 1989 and Petitioner's conviction and appeals took place thereafter, MICH. CT. R. 6.508(D) was a "firmly established" procedural rule for purposes of Petitioner's action. *See Luberda*, 211 F.3d at 1007; *Rogers v. Howes*, 144 F.3d 990, 994 (6th Cir.1998).

When a petitioner has procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

To show cause sufficient to excuse a failure to raise claims on direct appeal, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal.  *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991). Petitioner fails to assert any cause excusing his procedural default.  Where a petitioner fails to show cause, the court need not consider whether he has established prejudice.  *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).  Petitioner also has not demonstrated that manifest injustice would result because he has not made a colorable claim of innocence; he has not shown that any constitutional error "probably" resulted in the conviction of one who was actually innocent.  *Schlup*, 513 U.S. at 322 (citing *Murray*, 477 U.S. at 495).  This requires a showing "that 'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"  *Coleman v. Mitchell*, 244 F.3d 533, 540 (6th Cir. 2001) (quoting *Schlup*, 513 U.S. at 329).  Even though Petitioner maintains his innocence, he has not offered any new evidence in support of his claim.  Accordingly, Petitioner's last three habeas claims are procedurally defaulted.

## Conclusion

In light of the foregoing, the Court will deny Petitioner's application because it fails to raise a meritorious federal claim.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.

*Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's denial of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.


Dated:    August 4, 2016                          /s/ Paul L. Maloney
                                                  Paul L. Maloney
                                                  United States District Judge